Oh, I didn't check to make sure Judge Kelly. You all set, Judge Kelly? Man, I'm waiting for my coffee to be delivered. We'll just take a nap until we finish. Okay. Oh, that's how you see it. Okay, great. You may proceed. Good morning. May it please the court. Joseph Palmer for the government. The test for whether a suspect is in custody, this court reviews de novo. And that test is whether there are restraints on the suspect's freedom of movement to a similar degree as a formal arrest. So I'm going to stop you right there because I'm not sure we were in agreement on what the standard of review is. The ultimate question is de novo. But it's a very fact intensive inquiry. And we're here reviewing the district court's order in the light most favorable to the district court's determination. Isn't that right? I agree with that, Your Honor, that the subsidiary findings of fact, which we aren't challenging, this court would defer to those findings. But our submission to you is taking the facts as the district court found them, do they add up to restraints on a suspect on Mr. Nakai's freedom of movement to the same degree as if he were arrested? And our primary submission is that there weren't restraints. And your argument, your position is that our review of that issue is de novo. Correct. And I don't think that's disputed, Your Honor. There weren't restraints on Mr. Nakai's freedom of movement in this case. He accepted a polite request to speak with agents in their unlocked, unmarked vehicle that was parked on his own property just a few feet from his front door. He wasn't searched. He wasn't handcuffed. He wasn't touched. He entered the vehicle, opened the door, and got inside on his own. The interview was relatively brief. Was there a finding that the doors were locked or unlocked? Is that just an inference you're asking us to draw? No. The district court found that the doors were, in fact, unlocked. And what about whether Mr. Nakai knew that? There's no finding of whether Mr. Nakai knew that. I believe the finding is that they were visibly unlocked. And Mr. Nakai's subjective knowledge is, of course, not relevant. The test is whether a reasonable person in Mr. Nakai's position would believe that the doors were unlocked or locked. And we think the reasonable person would know that the doors were unlocked because he opened the door to get into the car, and there was no indication in the findings that something happened to cause them to be locked. And then at the close of the interview, he opened the door back up again and left. And so in those circumstances, I don't think it would be reasonable for him, for a reasonable person in that situation, to think that the doors were locked. In addition, he was in the front seat of an unmarked vehicle, not in the rear of a police vehicle where if a suspect were arrested, he would expect them to be positioned. And so in this case, Mr. Nakai freely left the vehicle at the end of the interview, and that is also a factor that weighs against a finding of custody in this case. And the encounter was over 40 minutes? It was, correct, Your Honor. Forty-one minutes, I think, is the duration of the interview. That is an amount of time, I think, in comparison to the case law that's considered to be relatively brief. It's shorter than the interview in Jones' case. It was 45 minutes to an hour. And so I think in that case, the duration of the interview is a factor that weighs against a finding of custody, in addition to the fact that Mr. Nakai was released at the end of the interview. The district court, in our view, went awry in ascribing inordinate weight to a few factors. One of them is that we concede, as a factor against the government in this case, that the agents did not specifically advise Mr. Nakai that he was free to decline to speak with them. But this Court's cases make clear that that is just one factor among many, and when the other factors indicate that there aren't restraints on the suspect's freedom of movement, then an interview can still be noncustodial. There's no pre-Miranda requirement that every time the police talk with a suspect, they must advise him that he's free to terminate the interview and leave. And we've cited to this Court that the closest case that we could find factually to what happened here is the Eighth Circuit's decision in the Johnson case, where no advisement was given, and where the sort of physical setup of the interview, in terms of taking place in the officer's vehicle, with two agents and the suspect in the front seat of the vehicle, was on all fours with this case. But in Johnson, I thought the Court said that the government there, the agents there, didn't use strong-arm tactics, right? And here, how are we supposed to understand that Mr. Nakai was told he needed to confess, and the nature of the encounter, as understood by the District Court, seems to have involved the things missing in Johnson. I don't think what happened here amounts to strong-arm tactics, but let me first come back to what happened in Johnson. In some ways, the questioning in Johnson was more difficult for the suspect, because the agents not only accused him of committing the crime, but they had definitive DNA testing that established, beyond any doubt, that the story that the suspect was telling was false, and they confronted him with that irrefutable evidence. Now, in this case, it's true that the agent's questioning was designed to elicit a confession, and it's true that they confronted Mr. Nakai with the victim's account, and it's true that they didn't believe his attempt to tell them that it was the child who had initiated the sexual contact. But none of that went to the suspect's freedom of movement. The Supreme Court's decision in Oregon v. Mathiason is clear, that the nature of the questioning only goes to the custody inquiry if it effectively implies a restraint on the suspect's freedom of movement. In that case, the officers accused the suspect of committing a burglary, and they lied to him and told him, your fingerprints were found at the scene, and that elicited a confession from the suspect. And the Supreme Court said, but that questioning has nothing to do with the custody inquiry, because it didn't effectively communicate to the suspect, you're arrested and you're no longer free to leave the interview. And so in our view, the district court gave inordinate weight to the nature of the questioning. Recording in progress. Shall I pause here? No. Gave inordinate weight to the nature of the questioning, and didn't make a finding that the questioning effectively communicated to Mr. Nakai that he was effectively under arrest. And if we look at the large... I'm sorry. So is your argument on that point reliant on... Because you started by saying that you don't question any of the district court's findings. You're not challenging any of the findings underlying the ultimate determination for clear error, right? Correct. So are you saying the court didn't make a necessary finding to support its reliance on the nature of the confrontation, or the nature of the questioning? I think we would characterize it maybe a little bit differently. We would say that this court should look at the nature of the question. What the district court found as to what was said and or implied in the question as a historical matter, this court should defer to that. And I think that's clear in the record. The district court sat out in detail what the agent said to Mr. Nakai. We're not disputing that that was what was said. There's a recording anyway. There's a recording. But what we think this court should look at independently is part of the de novo question would be, did that questioning suggest to a reasonable person that a restraint on freedom of movement of the same degree as a formal arrest? That's always the overarching question, regardless of which factors, non-exhaustive factors the court considers. The court should always be coming back to, does this look like a formal arrest situation? When defendants are arrested, it looks different from what happened here. Defendants are normally searched. They're normally handcuffed. If they're put in a police vehicle, it's in the backseat of it. There's multiple officers on the scene. Sometimes weapons are drawn. What have we said about how much like an arrest it has to be? I mean, what is really the difference between, in the government's view, between what's needed to show arrest and show custody? I think it's very close. Of a similar degree, I think, as a formal arrest, I think is the language that's used in the Supreme Court's cases and in this court's cases. And so the resemblance to an arrest situation, I think, has to be quite strong in order for an interview to be deemed to be custodial, because that's what we're asking is, we're not saying there have to be physically restraints, but a reasonable person has to perceive the situation as restraining to a similar degree as if he were actually arrested. The Supreme Court has said when you are in custody, such as an interview at a prison or an interview after a traffic stop when you're not free to leave, doesn't amount to custody under Miranda. So it's not just whether you're free to leave. Even if you're not free to leave, there's still apparently, clearly, more needed before it's like an arrest. Is that correct? That's correct. The Supreme Court in Howes v. Fields held in the prison context that when a prisoner was taken from the cell to a separate conference room in the prison, that that wasn't necessarily custody for Miranda purposes. And the same thing with traffic stops are generally not considered to be custodial for Miranda purposes. Because in addition to the restraints on the freedom of movement, the Supreme Court has said there has to be coercive pressures of a kind of similar degree that when an actual custodial interrogation is taking place. Let me ask about the nature of the questioning. He did not confess at this point, did he? He said things, or did he? Or did he still say it was the child's fault? Did he ultimately confess in this? I may be totally confused.  I think he did admit that sexual contact had occurred, but he persisted, I think, in saying that he wasn't the one that initiated it. And at what point did he admit that sexual contact had occurred? How far into the interview? Was it, in particular, was it before the officers started accusing him of lying and saying you need to confess? Had he admitted to sexual conduct before then? The sexual contact? I think the answer to that question is yes, Your Honor. That relatively early in the interview, he told the officers that what had happened was that the child was giving him a massage and that she had slipped. And it was at that point that the officers then began to engage in the form of questioning that the district court thought weighed in favor of custody when they said, look, we don't believe you that that's what has occurred. So if custody depends on whether the officers are being overbearing in their questioning, does that just mean that Miranda is required before the next step of the interrogation when the officers are starting to accuse him? In other words, say we thought that the overbearing questioning is what made this custody. If there was nothing new elicited after that, would that save you? Well, I think it would as to the statements that occurred before that. So in other words, I think if I'm understanding Your Honor's question, we agree that the court could draw a line at a certain point and say the interview was not custodial before that point, and then at a certain point it became custodial, and that would mean that only statements that occurred after that point would be subject to suppression. And the court did something like this in the Guillen case where it found agents were conducting a search, and at first the court said initially it wasn't custodial, but as they presented the suspect with all the bomb components that they were finding in the house, that it got to the point where it was inevitable that the defendant would be arrested, and the court said, okay, custody began at that point. Did you present it that way in your opening brief? I don't know, Your Honor. Our submission has been that the entire interview was non-custodial because there weren't restraints on the suspect's freedom of movement, and that the nature of the questioning, by analogy to the Supreme Court's decision in Oregon v. Mathias, didn't add up to an implication that the defendant's freedom of movement was restrained. It's not enough just that the agents elicited a confession or didn't believe the suspect's excuses. That's happened in many cases in which courts have found no custody. And if I could reserve the final minute of my time. May it please the Court. Jessica Stengel on behalf of Mr. Andy Nukai. The government says it takes no issues with the district court's findings of fact, but yet that isn't true. In their opening brief, at least 21 times, and in their reply brief, at least 10 times, they characterize what happened as voluntary. In this context, that's a factual determination.  It is, Your Honor. And it's not supported by anything in the record. Voluntary depends on what the officers did. That's a legal question. It's a mixed question of fact and law, which, as a constitutional issue, we review de novo. I think when we're determining if a statement is voluntary under Miranda, you're right, it is a legal question. In this context, it is a factual determination that goes to the overall question of whether Mr. Nukai was in custody when being interrogated by law enforcement. And whether he's in custody, that's a mixed question of law and fact that we review de novo. Am I wrong about that? You're not wrong about custody, but I think we're disagreeing in terms of voluntary in this case. Was a factual determination that the district court did not find support in any of the evidence presented and did not make such a finding that the government repeatedly uses it in its briefing does not turn it into something that it is not? Well, I think you can proceed from the point of departure based on the government's statements to us this morning that they do not challenge any of the facts as clearly erroneous. The question is at what level it's a fact. The historical facts are not being challenged. The illegal consequences of those historical facts is a matter that we review de novo. I 100% agree. And I think we can look to Miranda v. Arizona to appreciate, quote, the very fact of a custodial interrogation exacts a heavy toll on individual liberty. This court, in determining custody, consistently looks at three considerations. Whether there was police advisement, and this is not the first among equals. In many cases, this is dispositive. And necessarily, this makes sense. And I think we can find support for this in this court's determination in Wagner, where the court said that a person is repeatedly told that he is free to terminate an interview is powerful evidence that a person would have understood he was free to terminate the interview. The inverse necessarily must be true. That a person is not told necessarily means they understand they are not free to terminate the interview. I thought this issue of being told you're free to leave takes on significance when you're in what looks like a custodial situation. And by telling the person you're free to leave, you negate the oppressiveness of the encounter. I don't... It seems to be somewhat circular. As this court has used it, it is one consideration in determining custody. And this makes sense, necessarily. And if the facts would otherwise likely lead to a finding of custody, a determination of custody, but the officers clearly stated to the suspect you're free to leave, then it wouldn't be custody. I think that's the way in which it has... I'm probably wrong, but this is my understanding, my impression from the case law that if you look at the times when this is a determinative factor, it's when it's used the other way. And when everything looks oppressive, it's going to be custody unless there is a statement by the officers that you're free to leave, such as the airport case. Griffin, I think you have it exactly backwards. It is oftentimes the determinative factor in determining custody. And again, I'm going to say that this makes sense because any officer-citizen interaction is inherently coercive. We've all entered into a social contract that depends... If not telling someone they're free to leave establishes custody, then every traffic stop requires Miranda warnings because they're always in custody. They're not free to leave. I think that's... Why doesn't that follow from what your analysis says? I think the traffic situation and much like the situation in Howes v. Field is fundamentally different. Here we have an officer who... Two officers individually drove their unmarked but very clear police vehicles onto a remote road where there's a remote person. That was his property. His property. How should we be thinking about the fact that it was his property when we're taking that fact, historical fact, but we're reviewing DeNovo? Sure. I think we look at it in terms of whether this was a police dominated atmosphere, quite frankly. Again, putting it back into this court's analytical framework. Did the district court find it was a police dominated atmosphere? Yes. And is that a factual finding? It is a legal determination supported by the facts of the record. Any more questions on that? I think the question is, do we defer to that and review it only for clear error or do we review that DeNovo? You review the legal determination DeNovo and the facts are undisputed so you take those as given and you take any reasonable inference from those facts in the light most favorable to the district court's ruling. Now, we're using the word facts. We have to be precise about what you mean by a fact. And do you agree that it's the historical facts that we defer to the district court on but the characterization such as oppressive, custody, whatever. Those mixed questions of law and fact. We review DeNovo. Do you disagree with that? You review DeNovo with all reasonable inferences being drawn in favor of upholding the district court's ruling. All reasonable inferences about what? About historical facts? Or are you saying because if it's a mixed question of law and fact, which I think voluntary and custody are, then my understanding was, and correct me if I'm wrong because then I need to rethink this. On those matters, we review DeNovo. Custody is a legal determination that is reviewed DeNovo. In this particular setting, voluntary is a factual determination that the district court did not make. For example, the government says that it was obvious. Let's go with voluntary. The government says that Mr. Nakai voluntarily got into the truck. The way that it happened was that the FBI agent asked the Navajo investigator, why don't we get into my ride? And then turned to Mr. Nakai and says, why don't you, would you like to sit in the front seat? Whether that was voluntary, it seems to me we have to review DeNovo. No, I would disagree, Your Honor. That's a factual determination that we cannot, and the district court didn't make it, so any inference drawn must be made in favor of the district court's ruling. Gee, I thought there were plenty of ... I think we can look to United States v. Jones for a very good example of how this court deals with what is a legal question versus what is a factual question. But there are three types. There's a mixed question of law and fact, and that's what we're most interested in here. What actually happened? You reported what the officer said, what Mr. Nakai said, and so on. Those are historical facts. Those we review for clear air, if there were findings. Once we characterize that and say Mr. Nakai voluntarily got into the car or he was in custody, those are mixed questions of law and fact. And because this is a constitutional issue, particularly in the Miranda context, we review that DeNovo. To what extent? Go ahead. I think you and I are going to have to agree to disagree on this matter because the only legal question at issue here is whether Mr. Nakai was in custody. Based on all of the facts found by the district court, viewed in the light most favorable to that determination? Yes, Your Honors. I thought you agreed that whether he's in custody based on the historical facts is a mixed question of law and fact that we reviewed DeNovo. You don't agree with that? I disagree with that statement. That's fundamental. Now I'm confused too. I thought that you agreed that the ultimate determination was reviewed DeNovo. The ultimate, 100%, the issue of custody is reviewed DeNovo. And all of the historical facts, which nobody disagrees with, we all accept them as true. That's for clear air. We reviewed them in the light most favorable. And all the inferences drawn from those facts have to be reviewed in the light most favorable to the district court's ruling. Voluntariness is a legal issue. You can't say that a person observed the voluntariness. Voluntariness is a legal issue only when it comes in the context of after having been Mirandized and the defendant is arguing that his will was overcome. We can look at United States v. Pettigrew, which was an older case, and then from 2024 United States v. Little. Those are very clear. I've taken too much of your time on this issue. We'll just have to figure that out. How can we say that your client was in custody when there was no physical contact and only two officers. It was on his property. It just, you know, why isn't taking all of these sorts of facts as not clearly erroneous? The officers didn't raise their voices and that we still would say that there was custody here as a matter of law. So with the first factor, police advisement, that clearly didn't happen. Mr. Nakai could not know that he was free to leave. So then we look at whether it was a police-dominated atmosphere. And then we can finally look at whether the nature of the interrogation was coercive and accusatory. And I'm going to work backwards. The nature of the interrogation was absolutely coercive and accusatory. There were repeated accusations of him being a bad guy, of him not telling the truth. And in fact, at one point, the FBI officer, the agent says to Mr. Nakai, quote, is that what you're selling me? This is entirely dissimilar from the questioning in Jones and entirely on point with the questioning in Griffith, where it was repeated and prolonged accusations of wrongdoing with no possibility for anything other than that. Then we can look at whether this was a police-dominated atmosphere. And many things go into that particular consideration. We have officers, one of them who had a gun visible and one wearing the law enforcement badge. They put Mr. Nakai into a police truck on his own property. Nobody else was around. No one was going to overhear this. They deliberately kept him out of his home, away from his wife. This was a police truck. There was a police radio that had to be turned down and there was a rifle rack. The fact of where Mr. Nakai was sitting is irrelevant. In Jones, she was in the backseat and she was found not to be in custody. In large part because repeatedly the officer told her she was free to go, she didn't have to answer any questions. The officer repeatedly showed her that the door was unlocked. There was nothing coercive or overbearing and domineering about that encounter. It was the precise opposite of what happened here. And finally, the government wants this court to consider whether Mr. Nakai, consider the fact that Mr. Nakai was released at the end of his interrogation. This court does not consistently use this factor in determining whether a person was in custody. And it makes sense. It's somewhat of a curious factor in that custody would be determined based on what happens after the fact of the interrogation. And in this particular instance, based on the facts of this case, Mr. Nakai wasn't just told, alright, get out of here buddy. He was told very specifically, you're free to go inside. Implicit in that statement are two things. One, that he was not free to go before that. And two, he was free to go inside, telling, which conveyed to him that law enforcement knew exactly where to find him when they came back because they knew that he had done something wrong. Let me ask you a question with regard to oppressive. Your view is the entire time they were in the car there was the oppressive atmosphere that required a Miranda warning. Is that correct? No. Or did it happen at some point during the time in the car that it became oppressive enough that Miranda warnings were required? The latter, Your Honor. And at what point was that? I think drawing a bright line for any particular issue is somewhat of a dangerous exercise. But what I will say is that the recording, which you guys have, and the FBI agent himself have characterized it as, it started conversational but then turned confrontational. The first nine minutes of this interaction were benign. Absolutely. Did he? Nothing happened. And then it turned into a full-on interrogation because the officer knew, the officer believed, and this is when he told Mr. Nukai that you're lying and that the victim is telling the truth. So in the first nine minutes did he say that he had had contact, sexual contact, with the victim? No, Your Honor. There was no discussion. He didn't admit at all that he, at one point he's saying it was her fault. She's the one who initiated the contact. That was not in the first nine minutes? No. And the potential... That was early on. I've got the transcript right here. The agent said tell me about the massage that she used to give. I told her to just massage right here it got out of hand. She just slipped. I said no. The agent said I don't believe you. Mr. Nukai never admitted to anything. And the agent said, well he said I'd be sitting in the living room if she'd come in and stop punching me. Not stroking stuff here, agent. I know it did happen. And if you talk about it again, that's all I know. Never admitted anything. I'm out of time. May I respond? Yes. So to the extent that there were potentially incriminating statements made it happened within the first 15 minutes. So only six minutes after they had finished chit chatting. And the agent persisted then for another 15-20 minutes in accusing Mr. Nukai of being a liar and of being basically a bad person. These are the very strong arm tactics that Miranda very specifically warned against 60 years ago. Nothing's changed. And for that reason this court should... He specifically said I don't think you're a bad guy. And you just said it. He said it. You're a bad guy. You can listen to the record. We've got the tape. We can listen to it. You can listen to it. And I will just end with Miranda notes that one of the very tools... Your time is up. Thank you, Your Honor. Mr. Palmer, you have a few seconds. Thank you, Your Honor. Just very briefly, one point about voluntariness. We agree that that issue is part of the legal determination that this court would review de novo. But even if it weren't, I think the district court effectively found that Mr. Nukai's participation in entering the truck was voluntary when it found as a factor favoring the government and I'm quoting from page 37 of the district court's order, which is found at page 124 of the appendix, that Mr. Nukai complied with the agent's request to enter the agent's truck. And I don't think that would be a factor that favored the government if the district court's view had been that that was...